**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN L. PHELPS,<br><br>    Petitioner,<br><br>  v.<br><br>EDWARD ALAMEIDA,<br><br>    Respondent.<br><br>_____ | No. C 98-2002 MMC<br><br>**ORDER GRANTING MOTION TO LIFT STAY; DIRECTING CLERK TO ADMINISTRATIVELY REOPEN ACTION; GRANTING REQUEST TO AMEND MOTION TO FILE AMENDED PETITION; DENYING MOTION TO FILE AMENDED PETITION; DENYING MOTION FOR APPOINTMENT OF COUNSEL**<br><br>(Docket Nos. 99, 100, 102, 104) |

    On May 15, 1998, petitioner, a California prisoner proceeding pro se, filed the above-titled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Thereafter, the Court granted respondent's motion to dismiss the petition as untimely. Subsequently, the Ninth Circuit, in an opinion filed June 25, 2009, directed the Court to consider the merits of the petition. On February 24, 2010, respondent filed an answer to the petition.

    On March 10, 2010, petitioner filed a motion to stay further proceedings and hold the petition in abeyance while he returned to state court to exhaust state remedies with respect to recently discovered claims he intended to add to his petition by way of amendment. On January 19, 2011, the Court granted the motion and stayed the instant action. The Court further instructed that, within thirty days of exhausting the unexhausted claims, petitioner was to move to reopen the action and amend the petition to add the new claims.

Now pending before the Court are three motions filed by petitioner: (1) a motion to lift the stay and reopen the instant action; (2) a motion to amend the petition; and (3) a renewed motion for appointment of counsel.

**FACTUAL BACKGROUND**

Because the facts underlying petitioner's conviction inform the Court's analysis below, such facts, as found by the California Court of Appeal in a direct appeal brought by both petitioner and his codefendant, are copied here as follows:

> After three trials, appellants [petitioner] and [codefendant] Jason P. Dorton were convicted of murdering Mark Crosby. The first two trials ended in hung juries. . . .
>
> The Evidence at Trial
>
> On the afternoon of February 15, 1993, Mark Crosby was visiting some people in a front yard on Lucas Street in Richmond. Four men in a Peugeot pulled up and accosted him. Crosby immediately rode away on his bicycle and turned down Seventh Street. The Peugeot proceeded to the corner of Seventh and Lucas where all four occupants began shooting at Crosby. The driver and left rear passenger leaned out of their windows and the two passengers on the right side fired over the roof of the car. Crosby was hit in the back of the head and fell to the ground.
>
> The police found 9 millimeter and .223 caliber shell casings at the scene of the crime. Two 9 millimeter casings were located in the right front passenger area of the Peugeot when the car was found parked on a Richmond street the day after the shootings. Crosby's wound was most consistent with the kind of damage inflicted by a high velocity bullet fired from a rifle. A .223 caliber weapon could have inflicted the wound. The police found a Big Five Sporting Goods receipt in the Peugeot for five boxes of .223 ammunition. The receipt was dated the day before the shooting.
>
> The police recovered a Ruger P-85 semi-automatic pistol with a loaded magazine, a box of 9 millimeter ammunition, and a paper bag containing .223 ammunition in searches of [petitioner's] residence. The Ruger P-85 had fired the two 9 millimeter casings found in the Peugeot and six of the casings found at the crime scene. The .223 casings recovered at the scene had all been fired from one rifle, probably a Ruger mini-14. Five of the .223 cartridges found in the paper bag had been chambered in the same rifle but had not been fired. That weapon had also fired casings found in a carport at another address where [petitioner] lived when police responded to reports of gunfire on January 19, 1993.
>
> The police performed a gunshot residue test on [codefendant] Dorton's hands on the evening of the shooting. The test yielded a particle that could have been gunshot residue. When Dorton was arrested at around 5 p.m. on the afternoon of the shooting, he said to Officer Ward of the Richmond Police Department, "Ward, man, we got to get out of here. They are saying that we killed Mark Crosby over on Seventh Street." Dorton denied knowing anything about the

2

killing when interviewed at the police station later that same afternoon.

An associate of appellants' named Mondrell "Mooch" Johnson had rented the Peugeot from Troy Olsen in February 1993 in exchange for crack cocaine. [Petitioner] was present at the transaction. Another associate of appellants', Derrick Pride, was identified by a store clerk from Big Five Sporting Goods as one of four men who together had purchased the .223 ammunition the day before Crosby was shot.

Appellants were identified by Jonathan Robinson as two of the shooters in the Peugeot. Robinson was one of the persons Mark Crosby had been visiting on Lucas Street just before the murder. Robinson was unavailable at trial, but the prosecution read his testimony from the second trial to the jury. The jury also saw a videotape of Robinson's interview with the police on the day Crosby was killed.

Robinson had gone to Crosby's aunt's house at Sixth and Lucas after the shooting, where he spoke to Officer Ward. Robinson told Ward that [petitioner] had killed Crosby. A short time later Robinson picked [petitioner] and Dorton out of photo lineups. Robinson testified [petitioner] was in the right front seat of the Peugeot and had asked Crosby, "What's happening?" when the car pulled up on Lucas Street. Dorton was seated behind the driver. (In his initial interview with the police, Robinson described the person behind the driver as dark-skinned, but in court he said he had described him as light-skinned. Dorton is a light-skinned African-American.) Robinson did not recognize the other two occupants. However, a few days later [petitioner's] brother Lee was shot to death and Robinson called the police to tell them he had seen Lee's picture in the newspaper. He told the police he recognized Lee Phelps as the right rear passenger in the Peugeot.

Robinson confirmed his identification of appellants at trial. He said [petitioner] had used "some type of assault weapon," and the others had used 9 millimeter weapons. All the weapons were handguns. [Petitioner] was wearing a white baseball cap turned backwards and Dorton a black ski mask and black jacket. Dorton was wearing a black jacket when he was arrested on the evening of the shooting, and Robinson identified the jacket as the one Dorton had on during the shooting. Robinson knew Crosby from having worked with him in a barber shop, and knew appellants from the neighborhood. [Petitioner] had robbed him once.

Robinson was reluctant to testify because he and his family had been threatened. (The judge instructed the jury that Robinson's testimony about threats was not offered for the truth of the matter but only to show Robinson's state of mind.) A half-brother of Robinson's was killed about six months after Crosby's death and several people told Robinson he was the intended target. At that point Robinson approached the police and asked for help. They gave him $800 to relocate, and he went to Texas. Robinson had not appeared at the first trial and was in court for the second only because he had been arrested. He claimed to have met [petitioner] in the court holding cell where [petitioner] offered him money or drugs not to testify. Robinson admitted felony convictions for narcotics sales and possession of a weapon by a felon and was currently on probation for possession of stolen property.

The prosecution's theory was that Mark Crosby's murder was part of a feud between a group associated with Third and Main Streets and a group associated

3

with the Parchester neighborhood. Appellants belonged to the Third and Main group. Mark Crosby belonged to the Parchester group. Harold Oliver of Third and Main was murdered in late 1991, and members of the Parchester group were the suspected perpetrators. In June 1992, Derrick Brice of Third and Main shot Mark Crosby and Terrain Miller of Parchester. Brice was himself shot twenty minutes later. A few weeks after that Amad Sahn of Parchester shot John Wayne Foutenot of Third and Main. On February 6, 1993, Craig Bowen of Third and Main drove by a memorial service for a murdered Parchester associate and made a gesture of some sort, possibly with a firearm. Later that day Mark Crosby's brother Anthony fired shots at [petitioner's] residence, held a gun to the head of [petitioner's] cousin Rachelle, and threatened to kill her. Nine days later, Mark Crosby was killed, and three days after that Lee Phelps was killed.

Appellants presented an alibi defense. Defense witnesses testified appellants were at Third and Main on the corner or in a nearby apartment when Mark Crosby was murdered. On November 17, 1994, the jury found [petitioner] guilty of first degree murder and Dorton guilty of second degree murder.

(Resp. Answer, Ex. C at 1-5.)

## DISCUSSION

A. <u>Motion to Lift Stay and Reopen Action</u>

Petitioner requests to reopen the action on the ground his new claims are now exhausted. Respondent has not opposed the request. On or around February 23, 2010, petitioner asserted his new claims in a state habeas petition in the Superior Court of Contra Costa County. (<u>See</u> Mot. to Stay, Lodged Doc. No. 1.) On April 20, 2010, the superior court denied the petition both on the merits and on the ground the claims were untimely. (<u>See</u> Petitioner's May 24, 2010 Mot. to Extend Time, Ex. B.) Petitioner also filed state habeas petitions in the California Court of Appeal and the California Supreme Court, which petitions were summarily denied. (<u>See</u> Resp. Opp Mot. to Amend, Exs. 1, 2.) Accordingly, the Court finds petitioner has exhausted his state remedies on his new claims and will grant the motion to lift the stay and reopen the action.

B. <u>Motion to File Amended Petition</u>

Petitioner has filed a motion for leave to amend his petition.[1] Before addressing the merits of the motion, the Court first reviews petitioner's various claims.

---

[1] Petitioner has also filed an unopposed request to amend his motion to file an amended petition. (Docket No. 102.) The request to amend the motion will be granted.

4

In his original federal habeas petition, filed in this court on May 15, 1998, petitioner pleaded the following five claims: (1) the state court erroneously denied his motion for new trial; (2) trial counsel rendered ineffective assistance by failing to object to evidence concerning the involvement of gangs and gang membership in the murder; (3) trial counsel rendered ineffective assistance by failing to object to irrelevant evidence; (4) trial counsel rendered ineffective assistance by failing to object to improper and prejudicial arguments made in the prosecution's closing argument; and (5) trial counsel rendered ineffective assistance by failing to locate and present witnesses who would have testified petitioner did not commit the murder. As noted above, respondent has filed an answer addressing these five claims.

By the instant motion, petitioner seeks to amend his petition to include the following five newly exhausted claims (hereinafter, "new claims"): (1) trial counsel rendered ineffective assistance by failing to object to the trial court's failure to send the jury back for renewed deliberations after one juror expressed concern with the verdict; (2) trial counsel rendered ineffective assistance by failing to object to the trial court's acceptance of a "compromised" or "not unanimous" verdict; (3) trial counsel rendered ineffective assistance by failing to present evidence that other suspects committed the murder; (4) the prosecution suppressed the exculpatory results of a blood test; and (5) appellate counsel rendered ineffective assistance by failing to investigate and raise the foregoing four new claims on appeal and/or state habeas. (See Mot. to Amend Pet., Doc. No. 1.)

Respondent opposes the motion to amend on two alternative grounds. First, respondent argues this court is bound, as a matter of federal comity, by a state procedural bar. Specifically, as noted above, one of the grounds on which the state court denied the state petition on the new claims was untimeliness. Respondent argues California's timeliness requirement for state habeas petitions qualifies as an independent state ground, adequate to bar habeas corpus relief in federal court.

Second, respondent argues petitioner's new claims are untimely under federal law

5

because petitioner filed such claims long after the expiration of AEDPA's[2] one-year statute of limitations. See 28 U.S.C. § 2244(d). Respondent argues petitioner's new claims do not fall within the exception allowing the addition of newly exhausted claims that "relate back" to the claims in the original federal petition. See King v. Ryan, 564 F.3d 1133, 1142-43 (9th Cir. 2009).

The Court addresses each argument in turn.

1.      State Procedural Default

Respondent argues petitioner's new claims are procedurally defaulted. As noted above, the state superior court, in a reasoned decision, denied petitioner's state habeas petition on the new claims, in part on the ground the petition was untimely. (See Pet.'s App. For Enlargement of Time, filed May 24, 2010, Ex. B.) The California Supreme Court summarily denied the petition, citing In re Clark, 5 Cal. 4th 750 (1993) and In re Robbins, 18 Cal. 4th 770 (1998) . (See Resp. Opp Mot. to Amend, Exs. 2.) A citation to Clark and Robbins signals a habeas petition has been denied as untimely. Walker v. Martin, 131 S. Ct. 1120, 1124 (2011).[3]

A federal court will not review questions of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). California's timeliness rule is independent, Bennett v. Mueller, 322 F.3d 573, 582-83 (9th Cir. 2003), and adequate, Martin, 131 S. Ct. at 1131. It thus constitutes a basis for a federal district court to deny as procedurally defaulted a claim in a federal petition that was rejected for untimeliness in the California courts. Here, because petitioner's claims were denied as untimely by the California courts, they are procedurally defaulted, and, consequently, they

---

[2] Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

[3] In California, a state habeas petitioner who "belatedly presents a collateral attack . . . [must] explain the delay in raising the question." In re Swain, 34 Cal. 2d 300, 302 (1949). The rule in Swain "is commonly referred to as the 'untimeliness' bar." Washington v. Cambra, 208 F.3d 832, 833 (9th Cir. 2000).

6

are not subject to federal habeas review.

Procedural default, however, can be overcome if a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. The "cause standard" requires the petitioner to show that "'some objective factor external to the defense impeded counsel's efforts' to construct or raise the claim." McCleskey v. Zant, 499 U.S. 467, 493 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). "Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, [] a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause under this standard." Murray, 477 U.S. at 488 (internal quotations and citations omitted). As to the prejudice prong, petitioner bears the burden of showing, "not merely that errors at his trial created a <u>possibility</u> of prejudice, but that they worked to his <u>actual</u> and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original). "To ascertain the level to which such errors taint the constitutional sufficiency of the trial, they must be 'evaluated in the total context of the events at trial.'" See Paradis v. Arave, 130 F.3d 385, 393 (9th Cir. 1997) (quoting Frady, 456 U.S. at 169).

### a. Cause and Prejudice

In the instant matter, petitioner does not even attempt to show cause or prejudice. The Court next addresses those matters sua sponte.

#### *i. Cause*

Petitioner offers no reason for his waiting more than 13 years[4] to raise his new claims in a state habeas petition. Nor does it appear there was any bar to petitioner's raising his new

---

[4] Petitioner filed his first state habeas petition in November 1996, (see Petitioner's May 24, 2010 Mot. to Extend Time, Ex. B at 1), and his state petition on his new claims in February 2010 (see Mot. to Stay, Lodged Doc. No. 1).

claims in a timely fashion. Indeed, as discussed below, four of petitioner's new claims could have been brought immediately following his 1994 trial, and the fifth could have been brought shortly after his direct appeal was denied in 1996.

Three of petitioner's new claims allege ineffective assistance of trial counsel. Two of those claims involve trial counsel's handling of the trial court's response to a jury concern. The third ineffective assistance of trial counsel claim challenges counsel's decision not to focus on other suspects. Because such claims arise from the events at trial, the factual record relevant thereto was clearly available by the end of petitioner's trial in 1994. Further, the legal basis for an ineffective assistance of counsel claim was established long before the time of petitioner's trial. See Strickland v. Washington, 466 U.S. 668 (1984).

By his fourth new claim, petitioner contends the prosecution withheld from the defense the exculpatory results of a blood test. The prosecution had made a motion in the trial court to compel petitioner to submit to withdrawal of a blood sample, which the trial court granted on April 8, 1994. (CT at 4-8.) In support of its motion, the prosecution stated a blood splatter was found in the car used in the murder, and that it sought a blood sample from petitioner in order to have petitioner's blood typed and compared to the splatter in the car, possibly connecting petitioner to the crime. (Id.) Petitioner submitted to the blood test in 1994, but the results were never introduced at trial. Years later, in 2008, petitioner requested the results from the Contra Costa County Sheriff. (See Mot. for Stay, Ex. F.) Petitioner eventually received the test results from the California Attorney General on April 21, 2010. (See Mot. to Amend Pet. at Doc. 1, Ex. O.) The results showed petitioner was not the source of the blood found in the car. (See id.) Petitioner argues these results were exculpatory and were wrongfully withheld by the prosecution.

Irrespective of the merits of petitioner's claim, the factual record for such claim was clearly available by the end of petitioner's trial in 1994. Petitioner and defense counsel knew the blood had been taken for testing, and, given that the prosecution did not introduce the results at trial, it was obvious the testing showed petitioner was not the source of the blood splatter. Although petitioner claims he did not see the test results until 2010, there is no

8

1 showing the prosecution withheld those results from defense counsel. Even assuming,
2 arguendo, the prosecution actually failed to disclose the blood test results, petitioner was not
3 prevented from raising such claim in his first state habeas petition or on direct appeal.
4 Further, the legal basis for a claim alleging the prosecution's wrongful withholding of
5 evidence favorable to an accused was long established by the time of petitioner's trial. See
6 Brady v. Maryland, 373 U.S. 83 (1963).

Petitioner's fifth and final new claim asserts appellate counsel was ineffective for failing to raise the foregoing four new claims on appeal and/or state habeas. Even if, as a practical matter, petitioner may have had difficulty raising such a claim in 1996, the year in which he filed his state habeas petition on his initial claims, as it appears petitioner's counsel on direct appeal was the same person who was representing him in his 1996 state habeas petition (see Pet.'s App. For Enlargement of Time, filed May 24, 2010, Ex. B at 1), petitioner waited an unreasonable amount of time to do so thereafter. Petitioner did not bring this claim in state court until February 2010, more than thirteen years after the California Court of Appeal's October 1996 decision affirming the conviction and more than twelve years after his state habeas petition was denied in April 1997. Again, petitioner offers no reason for the delay, and the Court finds the delay was not justified, given that the underlying legal and factual bases for the arguments appellate counsel purportedly should have made were available as early as 1994, when petitioner's trial ended. See Bennett v. Mueller, 322 F.3d 573, 579-80 (9th Cir. 2003) ("While we have yet to determine the minimum amount of time that constitutes a substantial delay, we conclude that [petitioner's] six year post-Clark default certainly suffices.")[5]

### ii. Prejudice

Because petitioner fails to establish cause, the Court need not reach the prejudice

---

[5] The Court notes that ineffective assistance of counsel can provide the cause necessary to overcome the procedural default of other constitutional claims. See Edwards v. Carpenter, 529 U.S. 446, 451 (2000). The rule only applies, however, where such ineffective assistance claim is not itself procedurally defaulted. Id. at 453. Here, because petitioner's ineffective assistance of appellate counsel claim is procedurally defaulted, it cannot establish cause with respect to his other procedurally defaulted claims.

9

prong. Nevertheless, the Court will do so, and finds the claimed errors did not work to petitioner's "actual and substantial disadvantage, infecting his entire trial." Frady, 456 U.S. at 170.

First, as noted, two of petitioner's new claims assert ineffective assistance of trial counsel in the handling of the trial court's response to a jury concern. The Court sets forth below the following summary of the events at trial regarding the jury concern, as found by the state superior court in its April 22, 2010 decision denying petitioner's state habeas petition on the new claims:

> The jury commenced deliberations on November 15, 1994. . . .
>
> [T]he following occurred on November 17, 1994:
>
> At 11:22 a.m., the jury foreman wrote a note to the trial judge stating, "We have reached verdicts."
>
> At 11:44 a.m., the jury was brought into the courtroom and the verdict forms were given to the trial judge for inspection.
>
> After a sidebar with counsel, the trial judge stated that although the jury had tendered guilty verdicts, there was no verdict on the firearm enhancement. The trial judge then instructed the jury to return to the jury room to recommence their deliberations to address whether the firearm enhancement was true.
>
> Proceedings were reconvened at 11:57 a.m., whereupon a verdict finding [petitioner] guilty of first degree murder was read.
>
> The members of the jury were then collectively asked whether this was, "your verdict as read." Per the reporter's transcript, "all indicate in the affirmative." The jury's verdict finding true that [petitioner] personally used a firearm in the murder was then read. The members of the jury were then collectively asked whether this was, "your verdict as read." Per the reporter's transcript, "all indicate in the affirmative." The procedure was repeated for the guilty verdict on Count Two, grossly negligent discharge of a firearm.
>
> The noon recess was then taken.
>
> When proceedings reconvened, it was discovered that the jury had not made a finding whether [petitioner's] codefendant, Jason Patrick Dorton, had committed first or second degree murder. The jury recommenced their deliberations at 1:06 p.m.
>
> At 1:23 p.m., proceedings reconvened with Juror Number Six present, as Juror

10

Number Six had sent a cryptic note to the trial judge.[6]

The trial court start[ed] the proceeding by telling Juror Number Six, "I wasn't sure, [Juror's name], exactly what you had in mind here. And I wanted to just talk to you here by yourself so you could express yourself fully and freely."

The trial judge and counsel then attempted to flesh out the nature of Juror Number Six's concerns. Among other things, Juror Number Six stated that none of the jurors had threatened her, that she had followed the judge's instruction about deciding the case for herself, and that she was able to vote her own conscience regardless of what other jurors might think or say. However, Juror Number Six answered affirmatively to defense counsel's question regarding whether she felt it was necessary to deliberate again about [petitioner's] verdict. Juror Number Six also answered affirmatively to the trial judge's question about whether she would like more time to consider the verdict on [petitioner].

Responding to the trial judge's question regarding whether it would be agreeable to Juror Number Six to have the jury reconsider all possible verdicts for [petitioner], Juror Number Six stated: "Um, I-this morning I-I came in and took a moment to express a lot of what happened to me in there yesterday. And that, ah, some of -that I didn't want it to happen again today. That I wanted it to stop. And, um, I-I made my point but -I'm uncomfortable about, ah, the feelings of others."

Juror Number Six subsequently reiterated that she was willing to discharge her duties as a juror.

The trial court decided as follows:

"I think what we should do is let her go back to the jury room, participate in the remaining charges as to Mr. Dorton. When, at the appropriate time of polling the jury, each juror will be asked whether that is his or her verdict. At that time I can make the determination as to whether or not there is any problem[]."

After the jury had returned all verdicts for both defendants, the jury was polled. Prior to the poll, the trial judge admonished the jurors as follows: "[I]t is very important in the interests of justice to -- for you to inform the court whether or not your individual verdict is freely and voluntarily made, and it is your individual verdict."

Upon being polled, Juror Number Six stated that the guilty verdicts against [petitioner] as read by the court clerk were hers.

(Pet.'s App. For Enlargement of Time, filed May 24, 2010, Ex. B at 3-5.)

---

[6] In this note, Juror Number Six wrote to the trial judge: "First please keep in mind, in no way am I saying I cannot perform the duties asked of me. I am not sure, exactly how, if it is too late, or if I am able to speak to speak with you. I realize the serious consequence that could take place as a result of interrupting this trial. I would have a lot of people angry and might even create problems for myself." The note contains additional writing which is crossed-out.

11

As noted above, petitioner claims defense counsel rendered ineffective assistance by failing to object to the above-described procedure. A review of the record, however, shows defense counsel did in fact object. Specifically, after Juror Number Six reiterated she was willing to discharge her duties as a juror, a sidebar was held wherein the judge suggested the possibility of sending the jury back to begin renewed deliberations with respect to petitioner. (RT at 1370.) The prosecution argued that the jury, including Juror Number 6, had already rendered a verdict as to petitioner. (Id.) Defense counsel disagreed, stating:

> My reading is that she has not really rendered a verdict. It just happened. This was just blown by her. And she was forced into it. She was forced into a verdict which she had misgivings about. And she is telling us that she is not yet ready to render a verdict, and she needs to go back and do it right. I think that's what happened.

(Id.) The prosecution again asserted his position that the jury had rendered its verdict and that Juror Number Six "said it is her verdict." (Id.) Defense counsel again argued for redeliberation, stating:

> This is the type of case this could be reversible error. We have to keep this case clean. And -- I mean, this type of situation could get reversed and we would have another trial again. For God's sake, just send her back.

(Id. at 1371.) The trial judge then made the above-referenced recommendation, suggesting the jury be sent back for the limited purpose of deliberating as to Dorton and that a determination as to any problem with the verdict could be made when the jurors were individually polled. (Id.) Defense counsel made a final attempt to urge redeliberation as to petitioner, stating:

> Judge, it seems to me though that she said that she was -- did not -- she wanted to go back and consider with [petitioner]. I think I asked her one question.

(Id.) The trial judge declined, stating:

> Well, if she says it is not her verdict, then she can tell us that. Then that would take care of it. That's the purpose of the poll.

(Id.)

Petitioner's two new claims alleging defense counsel failed to object to the trial court's procedure are without merit. The record clearly shows defense counsel did object numerous times, and the objection was effectively overruled. Thus, petitioner cannot

12

1 establish he was prejudiced as a result of the claimed errors.

2 Petitioner's third new claim fails for similar reasons. Petitioner argues defense
3 counsel rendered ineffective assistance by failing to show that one or more of the other
4 suspects was the actual shooter. A review of the record, however, shows the evidence at trial
5 was that four people shot at the victim. (See RT at 603-08.) Consequently, evidence of any
6 particular individual's direct participation as a shooter did not necessarily exclude such
7 participation by another. Moreover, considerable evidence implicating persons other than
8 petitioner and his co-defendant in the murder was in fact presented to the jury, in part
9 introduced by the defense and in part by the prosecution. (See, e.g., RT at 218-22, 230-32,
10 993-94 (evidence that Diwon White was present in house searched following crime, gun and
11 ammunition were seized during search, and White admitted gun was his); RT at 539
12 (evidence that Derrick Pride had purchased .223 bullets on day before murder); RT at 501,
13 539 (evidence that person who sold bullets did not recognize petitioner and did not identify
14 petitioner from photo line-up); RT at 446-49, 456-57 (evidence that Mondrell Johnson was
15 present in house searched following crime and two ski caps were seized during search); RT
16 at 465, 540-41 (evidence that Mondrell Johnson had rented car used in murder); RT at 631,
17 853-54 (evidence that Craig Bowen, on February 6, 1993, drove past memorial service for
18 deceased rival gang member while displaying gun, after which Anthony Crosby, Mark
19 Crosby's brother, retaliated by firing at petitioner's residence and holding gun on petitioner's
20 cousin)).[7] (See, e.g., RT at 351, 850-55.) In sum, petitioner cannot show prejudice as a
21 result of the claimed error.

22 Likewise, petitioner cannot show prejudice concerning his alleged Brady claim,
23 discussed above, that the prosecution withheld the exculpatory results of a blood test. As
24 noted, petitioner has not shown the prosecution failed to disclose the results of the blood test
25 to the defense. Moreover, petitioner has not shown the results of the test, even if "favorable"

---

28 [7] White, Pride, Johnson, and Bowen are the four "suspects" petitioner identifies in his claim. (See Mot. to Amend Pet., Doc. No. 1 at 43-45.)

13

to petitioner, is evidence of such exculpatory nature as to be "material," nor is it sufficient to potentially change the outcome of petitioner's trial. See Brady v. Maryland, 373 U.S. 83 (1963) (holding prosecution must disclose evidence "favorable to an accused" where "material either to guilt or punishment"). The test results would show nothing more than petitioner was not the source of the blood splatter found in the car. Although a positive comparison would have put petitioner in the car, its absence does not show the contrary. In particular, there was more than one suspect in the car; moreover, there was no evidence that any of the shooters sustained injuries while in the car. See Strickler v. Greene, 527 U.S. 263, 281(1999) ("[T]here is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.")

b. Fundamental Miscarriage of Justice

Finally, petitioner does not satisfy the second possible exception to procedural default, that failure to consider the claims will result in a fundamental miscarriage of justice. The Supreme Court limits the "miscarriage of justice" exception to habeas petitioners who can show "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" Schlup v. Delo, 513 U.S. 298, 327 (1995) (quoting Murray, 477 U.S. at 496); see, e.g., Wildman v. Johnson, 261 F.3d 832, 842-43 (9th Cir. 2001) (holding petitioner must establish "factual innocence" in order to show fundamental miscarriage of justice would result from application of procedural default). Stated another way, petitioner must show "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Schlup, 513 U.S. at 327. For the reasons set forth in the Court's discussion of prejudice, petitioner cannot show a fundamental miscarriage of justice would occur if his new claims were not considered.

Accordingly, petitioner's motion to amend the petition will be denied on grounds of procedural default.

2. Untimeliness under AEDPA

Respondent argues petitioner's motion to amend must be denied on the separate and

14

independent ground that petitioner seeks to file the new claims in this court long after the expiration of AEDPA's one-year statute of limitations. Under AEDPA, petitions filed by prisoners challenging non-capital state convictions or sentences must be filed within one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).[8] "[T]ime during which a properly filed application for state post-conviction or other collateral review . . . is pending" is excluded from the one-year time limit. Id. § 2244(d)(2).

Here, the state courts' direct review of petitioner's conviction and sentence ended on April 30, 1997, the date on which the Supreme Court of California denied both the petition for direct review of petitioner's conviction and his state habeas petition. (See Petitioner's May 24, 2010 Mot. to Extend Time, Ex. B at 1.) The "time for seeking" direct review under 28 U.S.C. § 2244(d)(1)(A), however, includes the ninety-day period within which a petitioner may file in the United States Supreme Court a petition for a writ of certiorari under Supreme Court Rule 13, whether or not the petitioner actually files such a petition. See Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir. 1999). As a result, petitioner's "time for seeking" direct review expired, and the one-year limitations period for filing a federal habeas petition began, on July 29, 1997, ninety days after April 30, 1997. One year later, on July 29, 1998, the limitations period expired. Petitioner filed a state petition on his new claims in February 2010, over eleven years later.

Under such circumstances, petitioner's new claims are untimely, unless petitioner can show he is entitled to equitable tolling sufficient to render the claims timely, or, alternatively, that the claims relate back to the timely claims filed in the original federal petition.[9]

---

[8] In rare instances, not presented by the instant petition, the limitations period may run from a date later than the date on which the judgment became final. See 28 U.S.C. § 2244(d)(1)(B)-(D).

[9] The Ninth Circuit recently adopted an "actual innocence" exception to AEDPA's one-year statute of limitations. See Lee v. Lampert, 653 F. 3d 929, 936-37 (2011). To fall within this exception, a petitioner must meet the Schlup test, discussed above, i.e. the petitioner must show "'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" Lee, 653 F.3d at 938 (quoting Schlup, 513

a. Equitable Tolling

AEDPA's one-year statute of limitations is subject to equitable tolling in appropriate circumstances. Holland v. Florida, 130 S. Ct. 2549, 2560 (2010). "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Id. at 2562 (internal quotation and citation omitted); accord Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999) ("When external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim, equitable tolling of the statute of limitations may be appropriate."). The diligence required to establish entitlement to equitable tolling is "reasonable diligence." Holland, 130 S. Ct. at 2565.

Petitioner bears the burden of showing "extraordinary circumstances were the cause of his untimeliness." Spitsyn v. Moore, 345 F.3d 796, 799 (9th Cir. 2003) (internal quotation and citation omitted). Where a petitioner fails to show "any causal connection" between the grounds upon which he asserts a right to equitable tolling and his inability to timely file a federal habeas application, the equitable tolling claim will be denied. Gaston v. Palmer, 417 F.3d 1030, 1034-35 (9th Cir. 2005). Further, such petitioner must show "his untimeliness was caused by an external impediment and not by his own lack of diligence." Bryant v. Arizona Attorney General, 499 F.3d 1056, 1061 (9th Cir. 2007) (citing Roy v. Lampert, 465 F.3d 964, 973 (9th Cir. 2006).

Petitioner has failed to show he was prevented from filing his new claims on time. As discussed above, the Court finds no cause for petitioner's substantial delay in bringing the new claims, all of which could have been brought immediately after or within a few years of petitioner's 1994 trial. Thus, petitioner is not entitled to any period of equitable tolling, and the new claims will be dismissed as untimely, unless petitioner can show those claims relate back to the timely claims first filed in his original federal petition.

---

U.S. at 327). As discussed above, petitioner fails to make this showing.

### b. Relation Back

Amendments made to a habeas petition after AEDPA's one-year limitations period has run relate back to the date of the original petition when the claim asserted in the amended petition "'arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading'." Mayle v. Felix, 545 U.S. 644, 656 (2005) (quoting Fed. R. Civ. P. 15(c)(2)). "An amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." See id. at 650 (finding coerced confession claim did not relate back to original petition that raised factually distinct Confrontation Clause claim). In Mayle, the Supreme Court explicitly rejected the proposition that the "same 'conduct, transaction, or occurrence' [means the] same 'trial, conviction, or sentence.'" Id. at 664. Instead, relation back will only be applied when the original and amended petition plead claims that are "tied to a common core of operative facts." Id.

Petitioner's new claims for (1) suppression of exculpatory evidence in violation of Brady, and (2) ineffective assistance of appellate counsel are clearly unrelated to the claims in the original petition; neither new claim shares a common core of operative facts with any of the five claims contained in the original petition, all of which allege errors by the trial judge or trial counsel regarding matters separate and distinct from said new claims. Cf. Valdovinos v. McGrath, 598 F.3d 568, 575-76 (9th Cir. 2010) (holding Brady claim in amended petition related back to Brady claim in original petition where both based on undisclosed exculpatory evidence, albeit different pieces of evidence, "originating from materials from the police investigation"; further holding ineffective assistance of counsel claim in amended petition related back to ineffective assistance of counsel claim in original petition where both claims pertained to counsel's alleged failure to adequately investigate suppressed exculpatory evidence upon learning of it and amended claim "simply add[ed] more evidence that counsel did not uncover"). In sum, when compared with the original claims, these two new claims involve different alleged errors by different actors at different

1 times, and, consequently, do not share a common core of operative facts with the original
2 claims. See, e.g., Rhoades v. Henry (Haddon), 598 F.3d 511, 519-20 (9th Cir. 2010)
3 (holding district court properly denied leave to amend petition to add claims arising out of
4 alleged prosecutorial misconduct in withholding DNA test results; finding new claims did not
5 relate back to original claims, which concerned police questioning at time of arrest, jailhouse
6 informant testimony, and judicial bias); Hebner v. McGrath, 543 F.3d 1133, 1138-39 (9th
7 Cir. 2008) (holding district court properly denied leave to amend petition where later claim
8 was "directed at the jury instructions" on burden of proof and original claim involved
9 "evidence admitted at trial").

10 Nor do petitioner's new claims for ineffective assistance of trial counsel relate back to
11 the ineffective assistance of trial counsel claims asserted in his original petition. See United
12 States v. Ciampi, 419 F.3d 20, 24 (1st Cir. 2005) ("[A] petitioner does not satisfy the Rule 15
13 'relation back' standard merely by raising some type of ineffective assistance in the original
14 petition, and then amending the petition to assert another ineffective assistance claim based
15 upon an entirely distinct type of attorney misfeasance."); United States v. Gonzales, 592 F.3d
16 675, 679 (5th Cir. 2009) (same); United States v. Duffus, 174 F.3d 333, 337 (3d Cir. 1999)
17 (same); United States v. Craycraft, 167 F.3d 451, 457 (8th Cir. 1999) (same). In his original
18 federal petition, petitioner alleged trial counsel was ineffective in failing to object to
19 evidence, failing to object to improper closing argument, and failing to call certain known
20 individuals as defense witnesses. Petitioner's new claims of ineffective assistance assert trial
21 counsel failed to object to the trial court's handling of a juror's concern and failed to present
22 evidence that other suspects committed the murder.[10] These newly raised claims do not
23 satisfy the "time and type" and "common core" requirements for relation back. See Mayle,

---

[10] Petitioner's original claim that trial counsel should have presented certain defense witnesses is unrelated to his new claim that trial counsel should have presented evidence regarding other suspects. Specifically, the testimony the defense witnesses purportedly would have proffered did not relate to other suspects but, rather, would have been offered to show petitioner's co-defendant, Jason Dorton, was not in the car, which evidence, petitioner argues, would have discredited the prosecution's eyewitness, Jonathan Robinson. (See Pet. at 34-36.)

545 U.S. at 650, 664.

Accordingly, petitioner's new claims are time-barred by AEDPA, and the motion to amend will be denied on this separate and alternative ground.

C.   Motion for Appointment of Counsel

Petitioner has filed a renewed motion for appointment of counsel to represent him in this action. The Sixth Amendment's right to counsel does not apply in habeas actions. Knaubert v. Goldsmith, 791 F.2d 722, 728 (9th Cir.), cert. denied, 479 U.S. 867 (1986). Pursuant to statute, however, a district court is authorized to appoint counsel to represent a habeas petitioner whenever "the court determines that the interests of justice so require and such person is financially unable to obtain representation." See 18 U.S.C. § 3006A(a)(2)(B).

Here, petitioner's claims have been adequately presented in the petition, which, the Court notes, was prepared by counsel, and the interests of justice do not otherwise require the appointment of counsel. Accordingly, petitioner's motion for appointment of counsel will be denied without prejudice.

D.   Traverse

Due to the previously imposed stay of this action, petitioner has not had an opportunity to file a traverse addressing respondent's February 24, 2010 answer to the original federal petition. Petitioner will be given such opportunity as set forth in the Conclusion of this order. Petitioner is cautioned that the scope of the traverse is limited to his addressing the arguments in respondent's answer, and petitioner should not attempt therein to re-argue his new claims.

**CONCLUSION**

For the foregoing reasons, the Court orders as follows:

1. Petitioner's motion to lift the stay is hereby GRANTED; the stay entered January 19, 2011 is hereby LIFTED, and the Clerk is directed to ADMINISTRATIVELY REOPEN the instant action.

2. Petitioner's request to amend his motion to file an amended petition is hereby GRANTED.

3. Petitioner's motion to file an amended petition is hereby DENIED.

4. Petitioner's motion for appointment of counsel is hereby DENIED without prejudice.

5. If petitioner wishes to file a traverse responding to the arguments in respondent's February 24, 2010 answer to the original federal petition, he must do so within thirty days of the filing date of this order. Upon filing of the traverse or, alternatively if no traverse is filed within thirty days of the filing date of this order, the petition will be deemed submitted for a decision on the merits.

This order terminates Docket Nos. 99, 100, 102, and 104.

IT IS SO ORDERED.

DATED: December 7, 2011

_____
MAXINE M. CHESNEY
United States District Judge