1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN L. PHELPS,<br><br>    Petitioner,<br><br> v.<br><br>RICK HILL, Warden<br><br>    Respondent.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. C 98-2002 MMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK**

On May 15, 1998, petitioner, a California prisoner proceeding pro se, filed the above-titled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.   The Court subsequently granted respondent's motion to dismiss the petition as untimely.  Petitioner appealed and the Ninth Circuit, in an opinion filed June 25, 2009, reversed and directed the Court to consider the merits of the petition.  Respondent thereafter filed an answer to the petition and petitioner filed a traverse.[1]

## I.  PROCEDURAL HISTORY

On November 17, 1994, a Contra Costa County jury found petitioner and his co-defendant Jason P. Dorton ("Dorton") guilty of the murder of Mark Crosby ("Crosby").  (CT

_____

[1]  Petitioner initially named Edward Alameida, former warden of Deuel Vocational Institution, as the respondent in this action.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Rick Hill, the current warden of Folsom State Prison, where petitioner is currently incarcerated, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

United States District Court
For the Northern District of California

379, 382).[2]  Two earlier trials had ended in hung juries.  (Ex. C at 1.)  At the November 1994 trial, the jury found petitioner guilty of murder in the first degree and Dorton guilty of murder in the second degree; the jury further found both petitioner and Dorton had personally used a firearm in the commission of the murder.  (CT 379-80, 382-83.)  The trial court thereafter found true allegations that petitioner and Dorton committed the murder with the specific intent to benefit the unlawful conduct of a street gang.  (RT 1446.)[3]

On December 9, 1994, petitioner and Dorton jointly filed a motion for a new trial. (CT 385.)  On January 6, 1995, the trial court denied the motion for a new trial and sentenced petitioner to a term of 30 years to life in state prison.  (RT 1519; CT 453-54.)  Petitioner filed both a direct appeal and a habeas petition in the California Court of Appeal.  On October 28, 1996, the California Court of Appeal affirmed the judgment in a reasoned opinion (Ex. C), and, on February 6, 1997, denied the habeas petition as procedurally barred (Ex. N).  The California Supreme Court summarily denied review of the direct appeal on January 15, 1997 (Ex. J), and summarily denied review of the habeas petition denial on April 30, 1997 (Ex. P).

On May 15, 1998, petitioner filed the instant petition for a writ of habeas corpus.

## II.  STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

> On the afternoon of February 15, 1993, Mark Crosby was visiting some people in a front yard on Lucas Street in Richmond.  Four men in a Peugeot pulled up and accosted him.  Crosby immediately rode away on his bicycle and turned down Seventh Street.  The Peugeot proceeded to the corner of Seventh and Lucas where all four occupants began shooting at Crosby.  The driver and left rear passenger leaned out of their windows and the two passengers on the right side fired over the roof of the car.  Crosby was hit in the back of the head and fell to the ground.

---

[2]  Unless otherwise specified, all citations to transcripts and exhibits cited herein are to documents submitted by respondent in support of the Answer.

[3]  During pretrial proceedings, the trial court granted petitioner's motion to bifurcate the trial to allow the gang-enhancement allegation to be tried in a later phase (RT 47, 54-56), and each defendant subsequently waived his right to a jury trial on that allegation (RT 1350-59).

The police found 9 millimeter and .223 caliber shell casings at the scene of the crime.  Two 9 millimeter casings were located in the right front passenger area of the Peugeot when the car was found parked on a Richmond street the day after the shootings.  Crosby's wound was most consistent with the kind of damage inflicted by a high velocity bullet fired from a rifle.  A .223 caliber weapon could have inflicted the wound.  The police found a Big Five Sporting Goods receipt in the Peugeot for five boxes of .223 ammunition.  The receipt was dated the day before the shooting.

The police recovered a Ruger P-85 semi-automatic pistol with a loaded magazine, a box of 9 millimeter ammunition, and a paper bag containing .223 ammunition in searches of [petitioner's] residence.  The Ruger P-85 had fired the two 9 millimeter casings found in the Peugeot and six of the casings found at the crime scene.  The .223 casings recovered at the scene had all been fired from one rifle, probably a Ruger mini-14.  Five of the .223 cartridges found in the paper bag had been chambered in the same rifle but had not been fired.  That weapon had also fired casings found in a carport at another address where [petitioner] lived when police responded to reports of gunfire on January 19, 1993.

The police performed a gunshot residue test on [co-defendant] Dorton's hands on the evening of the shooting.  The test yielded a particle that could have been gunshot residue.  When Dorton was arrested at around 5 p.m. on the afternoon of the shooting, he said to Officer Ward of the Richmond Police Department, "Ward, man, we got to get out of here.  They are saying that we killed Mark Crosby over on Seventh Street."  Dorton denied knowing anything about the killing when interviewed at the police station later that same afternoon.

An associate of appellants' named Mondrell "Mooch" Johnson had rented the Peugeot from Troy Olsen in February 1993 in exchange for crack cocaine. [Petitioner] was present at the transaction.  Another associate of appellants', Derrick Pride, was identified by a store clerk from Big Five Sporting Goods as one of four men who together had purchased the .223 ammunition the day before Crosby was shot.

Appellants were identified by Jonathan Robinson as two of the shooters in the Peugeot.  Robinson was one of the persons Mark Crosby had been visiting on Lucas Street just before the murder.  Robinson was unavailable at trial, but the prosecution read his testimony from the second trial to the jury.  The jury also saw a videotape of Robinson's interview with the police on the day Crosby was killed.

Robinson had gone to Crosby's aunt's house at Sixth and Lucas after the shooting, where he spoke to Officer Ward.  Robinson told Ward that [petitioner] had killed Crosby.  A short time later Robinson picked [petitioner] and Dorton out of photo lineups.  Robinson testified [petitioner] was in the right front seat of the Peugeot and had asked Crosby, "What's happening?" when the car pulled up on Lucas Street.  Dorton was seated behind the driver. (In his initial interview with the police, Robinson described the person behind the driver as dark-skinned, but in court he said he had described him as light-skinned.  Dorton is a light-skinned African-American.)  Robinson did not recognize the other two occupants.  However, a few days later [petitioner's] brother Lee was shot to death and Robinson called the police to tell them he had seen Lee's picture in the newspaper.  He told the police he recognized Lee Phelps as the right rear passenger in the Peugeot.

3

United States District Court
For the Northern District of California

1

Robinson confirmed his identification of appellants at trial.  He said [petitioner] had used "some type of assault weapon," and the others had used 9 millimeter weapons.  All the weapons were handguns.  [Petitioner] was wearing a white baseball cap turned backwards and Dorton a black ski mask and black jacket.  Dorton was wearing a black jacket when he was arrested on the evening of the shooting, and Robinson identified the jacket as the one Dorton had on during the shooting.  Robinson knew Crosby from having worked with him in a barber shop, and knew appellants from the neighborhood. [Petitioner] had robbed him once.

Robinson was reluctant to testify because he and his family had been threatened.  (The judge instructed the jury that Robinson's testimony about threats was not offered for the truth of the matter but only to show Robinson's state of mind.)  A half-brother of Robinson's was killed about six months after Crosby's death and several people told Robinson he was the intended target.  At that point Robinson approached the police and asked for help.  They gave him $800 to relocate, and he went to Texas.  Robinson had not appeared at the first trial and was in court for the second only because he had been arrested.  He claimed to have met [petitioner] in the court holding cell where [petitioner] offered him money or drugs not to testify.  Robinson admitted felony convictions for narcotics sales and possession of a weapon by a felon and was currently on probation for possession of stolen property.

The prosecution's theory was that Mark Crosby's murder was part of a feud between a group associated with Third and Main Streets and a group associated with the Parchester neighborhood.  Appellants belonged to the Third and Main group.  Mark Crosby belonged to the Parchester group.  Harold Oliver of Third and Main was murdered in late 1991, and members of the Parchester group were the suspected perpetrators.  In June 1992, Derrick Brice of Third and Main shot Mark Crosby and Terrain Miller of Parchester.  Brice was himself shot twenty minutes later.  A few weeks after that Amad Sahn of Parchester shot John Wayne Foutenot of Third and Main.  On February 6, 1993, Craig Bowen of Third and Main drove by a memorial service for a murdered Parchester associate and made a gesture of some sort, possibly with a firearm.  Later that day Mark Crosby's brother Anthony fired shots at [petitioner's] residence, held a gun to the head of [petitioner's] cousin Rachelle, and threatened to kill her.  Nine days later, Mark Crosby was killed, and three days after that Lee Phelps was killed.

Appellants presented an alibi defense.  Defense witnesses testified appellants were at Third and Main on the corner or in a nearby apartment when Mark Crosby was murdered.  On November 17, 1994, the jury found [petitioner] guilty of first degree murder and Dorton guilty of second degree murder.

(Ex. C at 1-5.)

## III.  DISCUSSION

A.   <u>Standard of Review</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a);

4

Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v.

**United States District Court**
For the Northern District of California

1   <u>Esparza</u>, 540 U.S. 12, 17 (2003).

2   Here, as noted, the California Supreme Court summarily denied petitioner's petitions

3   for review. (Exs. J, P.) The Court of Appeal, in its opinion on direct review, addressed one

4   of the claims petitioner raises in the instant petition. (Ex. C.) The Court of Appeal thus was

5   the highest court to have reviewed said claim in a reasoned decision, and, as to said claim, it

6   is the Court of Appeal's decision that this Court reviews herein. <u>See</u> <u>Ylst v. Nunnemaker</u>,

7   501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

8   As to the claims for which there is no reasoned opinion available, the United States Supreme

9   Court has recently clarified that a federal habeas court, in applying the review provisions of

10  28 U.S.C. § 2254(d), looks to the result reached by the highest state court, and the absence of

11  reasoning does not prevent application of the standard of review set forth in § 2254(d). <u>See</u>

12  <u>Harrington v. Richter</u>, 131 S. Ct. 770, 784-85 (2011).

13  B.   <u>Petitioner's Claims</u>

14  Petitioner claims his conviction and sentence are invalid because: (1) the state court

15  erroneously denied his motion for new trial; and (2) trial counsel rendered ineffective

16  assistance. The Court addresses each claim in turn.

17  1.   <u>Motion for New Trial</u>

18  Petitioner claims the trial court erred in not granting him a new trial based on newly

19  discovered evidence, specifically the testimony of Edward Turner ("Turner"). (Pet. at M-2 –

20  M-5.) The Court of Appeal summarized the background of this claim as follows:

21      On December 9, 1994, appellants filed, a motion for a new trial based on newly
        discovered evidence. They attached a declaration from Edward Lee Turner,
22      who witnessed the shooting of Mark Crosby. They also attached a copy of the
        police report of Turner's interview at the police station on the day of the
23      shooting. In his declaration, Turner stated he had disappeared after the
        interview because there were warrants out for his arrest. He was arrested on
24      November 16, 1994, met [petitioner] for the first time in jail, and agreed to
        speak with defense counsel. Turner had been a passenger in a car driven by
25      his friend, Carolyn Morgan, on the afternoon of the murder. Approaching the
        corner of Eighth and Lucas Streets, they had passed a gold car. When they
26      stopped at the corner the gold car pulled away making a screeching noise and
        Turner looked back at the driver and front passenger. John Robinson and Mark
27      Crosby were standing near the corner. Morgan turned right onto Lucas heading
        toward Seventh Street. Turner saw Crosby riding his bike in a hurry. The gold
28      car then passed Morgan's car and stopped near the corner of Seventh and

Lucas. Turner heard someone shout something like, "Mark, it's your turn." The driver and left rear passenger began shooting at Crosby with 9 millimeter handguns. The right side passengers stood on the street shooting over the Peugeot toward Crosby. The front passenger used a 9 millimeter handgun, while the right rear passenger used a long AK-47 or M-1 rifle.

Turner declared he got the best look at the right rear passenger, whom he described as tall and light-skinned with a mustache and possible goatee, wearing a black cap and Raiders jacket. This man had looked directly at Turner and Turner was afraid he would shoot him. Morgan had shouted at Turner to get down, but the car was too small and Turner kept looking out the windshield. The right front passenger was tall, had his hair in corn rows, and wore a long black canvas jacket. Turner did not see the left passenger's face but saw his hand extended out the window and his skin was very dark. Spent casings flew onto the hood of Morgan's car. When the police arrived Morgan and Turner followed directions to move the car. Turner knew Officer Ward, who told him to go to the station for an interview. Turner did so and was interviewed by Officer Williams. There were many interruptions during the interview and Turner did not want to get involved so he only answered questions and volunteered nothing. He had seen John Robinson's car near the station and did not want to get involved with him because he did not associate with Robinson's group. Turner was shown two photo lineups and could not identify any shooters in them. He was asked to describe the shooters, but was interrupted before he could describe the front passenger. He knew the police, the District Attorney, and investigators for the defense were looking for him after the interview but avoided them. After meeting [petitioner] in jail he was certain [petitioner] was not the right front or right rear passenger in the Peugeot.

When interviewed by police on the day of the shooting, Turner told them that he and Morgan had encountered the gold Peugeot double-parked on Lucas near Eighth. The right front and right rear passengers of the Peugeot were talking to Crosby. The Peugeot passed by and stopped at the corner of Seventh, where the firing began. The right rear passenger used an AK-47 type assault weapon while the others had handguns. The Peugeot driver was dark with short curled hair; the left rear passenger wore all black; the right rear passenger was light with a possible mustache and goatee, black Raiders jacket and black cap, and medium build. The report notes that Turner did not describe the right front passenger. Turner was given photo lineups numbered 1 and 4, which contained photos of the appellants, and he could not identify the occupants of the Peugeot.

The new trial motion was also supported by declarations from defense counsel and a defense investigator, stating they had unsuccessfully tried to locate Turner before his arrest. They had visited Turner's grandmother's house, asked people in the neighborhood, and checked county jails and court records.

The prosecution responded to the new trial motion by arguing (1) the evidence was not newly discovered because the defense was aware from the beginning that Turner was an eyewitness who failed to identify appellants; (2) the defense did not exercise due diligence in locating Turner; and (3) Turner was not a credible witness, since in his interview on the day of the crime he had failed to supply the descriptive details he was now providing regarding the front and left rear passengers.

Turner appeared at the hearing on the motion and was cross-examined by the

prosecution.  He admitted having three convictions for assault and a pending trial on charges of robbery and cocaine possession.  He said he was in Dunnigan, California during much of the time since Crosby's killing, but from March until August 18, 1993, he was incarcerated in the county jail in Martinez.  He was released on probation and stayed out of sight, going between Richmond and Dunnigan, where his stepmother had a farm.  He did not tell his probation officer he was in Dunnigan, but the Probation Department probably had the address as part of his family background information.  He spoke with his probation officer on the phone and left him messages but never met him.  When in Richmond he stayed with his brother, sister, or aunt.  He was arrested in July 1994, held for around 20 days, then released again until his latest arrest on November 16.

Turner testified that when he spoke to the police on the day of the shooting he told them "what I felt was substantial at the time."  He remembered giving detailed descriptions of the driver and right rear passenger, but not of the other two men in the Peugeot.  He did not remember reporting a conversation between Crosby and the men in the car, and he did not currently remember such a conversation.  He thought his memory of the events was better now than it was on the day in question.  The court heard a tape recording of Turner's interview with the police, which lasted thirteen minutes.

Defense counsel argued Turner's testimony was more accurate than Robinson's, since Turner described the type of weapon that killed Crosby while Robinson did not.  Counsel noted the tape showed Turner was not asked about the right front passenger.  Counsel contended a fourth trial was warranted so a jury could consider Turner's version of the events.

The prosecutor asserted the tape of Turner's interview showed he was anything but a reluctant witness.  He was eager to provide information and asked for money in return.  The tape recorded Turner's report of an argument between Crosby and the men in the Peugeot.  The prosecutor also emphasized that Turner, who had only one eye, had made it clear that the only shooter he saw well enough to identify was the right rear passenger.  The prosecutor doubted Turner's claim that his memory had improved over the nearly two years since the incident.  Finally, the prosecutor noted the defense had the tape of Turner's interview from the beginning and failed to exercise due diligence in finding him.  Turner had been in the local jail before and during the second trial which was held at the beginning of August 1994, but the defense had neglected to find him despite claiming to have checked the jails.  The defense had not asked the prosecution for information on Turner's location.  Defense counsel explained they had to share one investigator who was very busy during the second trial.

The trial court denied the motion for a new trial.  It ruled that Turner's testimony was not really new evidence because his earlier taped interview had been known by the defense.  The court also found Turner's testimony lacked credibility since what he said shortly after the "harrowing experience" of being "virtually in the direct line of fire" was "obviously much more likely to have been truthful, rather than his testimony that he has given very nearly two years after the event."

(Ex. C at 5-8.)

Petitioner's claim is unavailing, for the reason that petitioner has not stated a

8

1  cognizable federal claim.

2      "[R]elief may not be granted [under § 2254] unless the state court adjudication

3  'resulted in a decision that was contrary to . . . clearly established Federal law, as determined

4  by the Supreme Court of the United States'." <u>Bobby v. Mitts</u>, 131 S. Ct. 1762, 1763 (2011)

5  (quoting 28 U.S.C. § 2254(d)(1)).  "[I]t is the habeas applicant's burden to show that the state

6  court applied [clearly established federal law] to the facts of his case in an objectively

7  unreasonable manner."  <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002).

8      Petitioner has not cited to clearly established Supreme Court precedent holding a

9  federal habeas petitioner has a right to a new trial.  Indeed there is no such authority.  Rather,

10  as the Supreme Court has observed, "[c]laims . . . based on newly discovered evidence have

11  never been held to state a ground for federal habeas relief absent an independent

12  constitutional violation occurring in the underlying state criminal proceeding, <u>see</u> <u>Herrera v.</u>

13  <u>Collins</u>, 506 U.S. 390, 400 (1993), such as, for example, "ineffectiveness of [trial] counsel"

14  or "withholding of evidence by the prosecution," <u>see</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 314

15  (1995).[4]  "[T]he existence merely of newly discovered evidence relevant to the guilt of a

16  state prisoner is not a ground for relief on federal habeas corpus."  <u>Herrera v. Collins</u>, 506

17  U.S. at 400 (internal quotation and citation omitted).

18      Accordingly, petitioner is not entitled to habeas relief on this claim.

19      2.      Ineffective Assistance of Trial Counsel

20

21      Petitioner claims his trial counsel provided ineffective assistance by failing to:

22  (1) object to evidence concerning the involvement of gangs and gang membership in the

23  murder; (2) object to irrelevant evidence; (3) locate and present witnesses who would have

24  testified petitioner did not commit the murder; and (4) object to improper and prejudicial

25  arguments made in the prosecution's closing argument.

26      A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

27  _____

28      [4] Petitioner's claim alleging ineffective assistance is discussed below.

United States District Court
For the Northern District of California

9

United States District Court
For the Northern District of California

1   Sixth Amendment right to counsel, which guarantees not only assistance, but "effective"

2   assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to

3   prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first

4   must establish such counsel's performance was deficient, i.e., that it fell below an "objective

5   standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, the

6   petitioner must establish prejudice resulting from his counsel's deficient performance, i.e.,

7   that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

8   of the proceeding would have been different." Id. at 694. "A reasonable probability is a

9   probability sufficient to undermine confidence in the outcome." Id.

10      A federal habeas court considering an ineffective assistance claim need not address

11   the prejudice prong of the Strickland test "if the petitioner cannot even establish

12   incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir.

13   1998). Conversely, the court "need not determine whether counsel's performance was

14   deficient before examining the prejudice suffered by the defendant as a result of the alleged

15   deficiencies." Strickland, 466 U.S. at 697.

16      A "doubly" deferential judicial review applies in analyzing ineffective assistance of

17   counsel claims under 28 U.S.C. § 2254. See Cullen v. Pinholster, 131 S. Ct. 1388, 1410-11

18   (2011). The rule of Strickland, i.e., that a defense counsel's effectiveness is reviewed with

19   great deference, coupled with AEDPA's deferential standard, results in double deference. See

20   Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010). Put another way, when § 2254(d)

21   applies, "the question is not whether counsel's actions were reasonable[;] [t]he question is

22   whether there is any reasonable argument that counsel satisfied Strickland's deferential

23   standard." Harrington v. Richter, 131 S. Ct. 770, 788 (2011). Moreover, because

24   Strickland's standard for assessing defense counsel's effectiveness is a "general" one, state

25   courts have "greater leeway in reasonably applying [that] rule," which in turn "translates to a

26   narrower range of decisions that are objectively unreasonable under AEDPA." See Cheney,

27   614 F.3d at 995 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

28

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a.     Gang Evidence

Petitioner claims trial counsel should have objected to testimony by two prosecution witnesses, Sergeant Michael Gormely ("Sgt. Gormely") and Officer Ron Ward ("Officer Ward"), regarding "gang evidence."  (Pet. at M-7.)  The Court addresses each witness separately.

i.     Testimony by Sgt. Gormely

Petitioner claims his trial counsel was ineffective because of the manner in which counsel objected to certain testimony given by Sgt. Gormley, the primary investigator assigned to the case, about photographic lineups.

During the prosecution's case in chief, the prosecutor asked Sgt. Gormley what procedure he had followed when he prepared the photographic lineups he showed to Robinson.  Sgt. Gormley answered as follows:  "What I did was . . . you get six photographs of similar appearing males.  On each one of these photographic lineups there is someone known to me to be a member of the Third & Main Gang.  What I did, I got five other persons - - -."  (See RT 531:22 - 532:1.)  At that point, counsel for petitioner interrupted the testimony and stated:  "Object, and ask that be stricken.  The last remark about the Third & Main Gang."  (See RT 532:2-3.)  Before ruling on the objection, the trial court questioned Sgt. Gormley and allowed the prosecutor to ask clarifying questions, in response to which Sgt. Gormley testified he had obtained "information" that the "Third and Main boys" were "involved" in the shooting and that he had "predicated [his] decision" to compile the lineups in the manner he did in light of such information.  (See RT 532:18-26.)  The trial court then overruled the objection.  (See RT 532:27-28.)[5]

Petitioner contends the objection made by his counsel was insufficient.  Specifically, petitioner contends counsel should have made specific objections based on "hearsay, lay

_____

[5] A short time thereafter, Sgt. Gormley testified that he showed Robinson a photographic lineup that included a photograph of Dorton, and that Robinson "immediately" identified Dorton.  (See RT 536:25 - 537:4-7).

opinion, violation of the Confrontation Clause, or lack of personal knowledge" rather than objecting only to the use of the word "gang."  (See Pet. at M-7.)[6]

Petitioner, however, points to no evidence in the record to support his assertion that the scope of his counsel's objection was limited to Sgt. Gormley's use of the word "gang," or that the trial court understood the objection as being so limited.  Under suchcircumstances, the California Supreme Court reasonably could have concluded that petitioner failed to meet his burden to demonstrate that the manner in which the objection was made constituted an "error[ ] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  See Strickland, 466 U.S. at 687.[7]

Further, the California Supreme Court reasonably could have found, even if it assumed the objection was limited to Sgt. Gormley's use of the word "gang," that counsel had a tactical reason for not objecting to the testimony on grounds challenging, in effect, whether Sgt. Gormley had personal knowledge as to petitioner's membership in a gang. Petitioner points to nothing in the record to suggest Sgt. Gormley could not have provided facts to support his testimony that petitioner was a member of the Third & Main Gang, and counsel for petitioner may well have determined that petitioner's defense would not have been advanced by having Sgt. Gormley so testify.

Accordingly, to the extent petitioner's ineffective assistance claim is based on the manner in which his counsel objected to Sgt. Gormley's testimony concerning preparation of photographic lineups, petitioner fails to show he is entitled to habeas relief.

---

[6] As discussed in greater detail below, the trial court, later in the proceedings, precluded the prosecution from eliciting the word "gang" from another police witness and instructed that witness to use the word "group."  No such ruling had been made, however, at the time Sgt. Gormley gave the above-referenced testimony.

[7] The California Supreme Court, the only state court to consider the merits of this claim, denied the claim without setting forth its reasoning.  (See Ex. P.)  Under such circumstances, "a habeas court must determine what arguments or theories . . . could have supported [ ] the state court's decision," and "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  See Harrington, 131 S. Ct. at 786.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii. <u>Testimony by Officer Ward</u>

At trial, the prosecution offered the testimony of Ron Ward ("Officer Ward"), who, at the time of the murder and the subsequent investigation, was a police officer with the City of Richmond.  Prior to trial, the prosecution had planned to qualify Officer Ward as a gang expert and to offer his testimony to support, <u>inter alia</u>, the allegation that petitioner and Dorton had committed the murder with the specific intent to benefit the unlawful conduct of a street gang.  As discussed above, however, <u>see</u> n. 3, the trial court, over the prosecution's objection, granted petitioner's motion to bifurcate the proceedings, such that the enhancement allegation would be considered in a second phase.  In so ruling, the trial court nonetheless agreed with the prosecution that evidence bearing on the defendants' membership in a gang and the victim's membership in a rival gang would be admissible in the first phase to demonstrate motive.  (<u>See</u> RT 53-54.)

During her opening statement, the prosecutor told the jury it would hear testimony from Officer Ward, a "gang expert" who would be "giving [the jury] his opinions."  (<u>See</u> RT 138:22-24.)  Although counsel for petitioner immediately asked that the prosecution be "cautioned" in light of the trial court's pretrial order limiting the scope of the first phase, the trial court declined to do so, stating the prosecution's description of the proposed evidence was "within the ambit" of what would be allowed.  (<u>See</u> RT 138:25 - 139:3.)  Later in the trial, on the morning of the day the prosecution was planning to call Officer Ward, the trial court inquired of the prosecutor, outside the presence of the jury, "exactly what [she] propose[d] to ask" Officer Ward.  (<u>See</u> RT 730:9-15.)  The prosecutor stated that Officer Ward, in addition to testifying about his role in the investigation of the shooting, would "give his qualifications in the area of investigation of gangs."  (<u>See</u> RT 730:16-25.)  When counsel for petitioner objected to evidence of "gang membership" being admitted in the first phase, the trial court ruled that Officer Ward could not use the word "gang."  (<u>See</u> RT 738:1-2 ("I'm concerned about the word gang.  I don't want that to be used.").)  The prosecution then indicated that Officer Ward would use the word "group," and would testify that "this

13

United States District Court
For the Northern District of California

1    particular murder was a result of a feuding between [ ] two groups and go into the history of

2    this feuding."  (See RT 738:3-9.)  The trial court indicated such testimony would be

3    admissible, explaining:  "[T]here is nothing wrong to show that there has been a group

4    discourse of some kind.  Animosity and fights.  Or arguments or disagreements.  Those are

5    all motive factors."  (See RT 739:1-3.)

6        During his direct testimony in the first phase, Officer Ward testified about his years of

7    experience investigating "local feuds between local groups" in Richmond.  (See RT 848:5-

8    850:11.)  He also testified he was aware of a "group" associated with Third and Main Streets,

9    and identified by name ten individuals he associated with said group, including petitioner and

10   Dorton.  (See RT 850:15-28.)  Additionally, he testified he was aware of a "group"

11   associated with Parchester, and identified by name eight individuals he associated with said

12   group, including Crosby, the homicide victim.  (See RT 851:12-21.)  Further, when the

13   prosecutor asked him whether, based on his "contacts with individuals in the city" and on

14   "information that [he] received either through police reports or someone actually talking to

15   [him]," he knew that the Third and Main and the Parchester "groups" had been "feuding," he

16   answered, "Yes."  (See RT 851:22-28.)  Officer Ward also testified the two groups had been

17   engaged in a feud that began in early 1991 and continued through the time of the February

18   15, 1993 shooting of Crosby and the murder of a brother of petitioner in late February 1993.

19   (See RT 852:1 - 854:20.)

20       After the jury convicted petitioner and Dorton, the trial court conducted the second

21   phase and, at that time, found Officer Ward was qualified to give expert testimony.  (See RT

22   1404.)  The trial court, after hearing additional testimony from Officer Ward, as well as

23   considering other evidence, found true the allegation that petitioner and Dorton committed

24   the murder with the specific intent to benefit the unlawful conduct of a street gang.  (See RT

25   1446.)

26       Petitioner alleges his counsel provided ineffective assistance by failing to object to

27   Officer Ward's testimony, given on direct examination during the first phase, in which

28

14

United States District Court
For the Northern District of California

1   Officer Ward identified members of the two "groups" and recounted the history of feuding

2   between the two groups.  Specifically, according to petitioner, his counsel was ineffective by

3   not objecting to such testimony on grounds of "hearsay, lay opinion, violation of the

4   Confrontation Clause and lack of personal knowledge."  (Pet. at M-8.)  Petitioner, in making

5   such argument, correctly observes that Officer Ward was not formally qualified as a gang

6   expert in the first phase of the trial.

7            As noted, counsel for petitioner successfully moved to bifurcate the proceedings such

8   that the gang enhancement allegations would be tried in a second phase, and, further,

9   successfully obtained an order precluding Officer Ward from using the word "gang" during

10  his testimony before the jury in the first phase.  As set forth above, however, the trial court,

11  after considering the prosecution's offer of proof as to Officer Ward's proposed testimony,

12  found his testimony regarding "groups" would be relevant to the issue of motive.  Further,

13  during the second phase of the trial, the trial court did qualify Officer Ward as an expert, in

14  light of Officer Ward's testimony that his opinions were based on his personal observations

15  and on his discussions with gang members, with other individuals in the community, and

16  with fellow police officers over the course of a number of years working throughout the city

17  of Richmond.  See, e.g., People v. Olguin, 31 Cal. App. 4th 1355, 1370 (1994) (holding

18  "police officers testifying as gang experts present[ ] an adequate foundation for their opinions

19  where they base[ ] their testimony on personal observations of and discussions with gang

20  members as well as information from other officers and the department's files") (internal

21  quotation and citation omitted).

22           Under such circumstances, the California Supreme Court reasonably could have found

23  petitioner's counsel made a tactical decision not to object to Officer Ward's testimony on

24  hearsay or the other grounds identified by petitioner.  In particular, the California Supreme

25  Court could have determined defense counsel had concluded that, if such an objection were

26  made and sustained, the prosecution likely would have sought to have Officer Ward formally

27  qualified as an expert in the first phase, thus making it difficult, if not impossible, to avoid

28

United States District Court
For the Northern District of California

1  the word "gang," as well as risking the introduction of further damaging testimony pertaining

2  to petitioner, or about the dangers posed by gangs in general.[8]

3        Additionally, the California Supreme Court reasonably could have found the failure to

4  object resulted in no prejudice, because the objection would have been overruled after the

5  prosecution laid the foundation for Officer Ward's expertise, as was done in the second

6  phase.  See Matylinsky v. Budge, 577 F.3d 1083, 1093-94 (9th Cir. 2009) (holding trial

7  counsel's failure to object to testimony is not deficient, where objection would have been

8  properly overruled).

9        Accordingly, to the extent petitioner's ineffective assistance claim is based on a

10  failure to object to Officer Ward's testimony concerning "groups," petitioner fails to show he

11  is entitled to habeas relief.

12                    b.      Irrelevant Evidence

13        Petitioner claims trial counsel should have objected to "irrelevant evidence"

14  concerning use of a gun in a different crime and possession of a motel key.  (Pet. at M-9.)

15  The Court addresses these two categories of evidence separately.

16

17                    i.  Gun's Use in Other Crime

18        At trial, Officer Steve Zeppa ("Officer Zeppa") testified that, subsequent to the

19  investigation of Crosby's death, he investigated a May 1993 shooting of two police officers,

20  that an individual named Daniel Wade ("Wade") had been arrested for the shooting, and that,

21  while executing a search warrant in connection with said investigation, he recovered a

22  weapon (see RT 328:14 - 329:11), which weapon was introduced into evidence as People's

23  Exhibit 20 (see RT 330:18-21).  A firearm examination expert, Kenneth Fujii, described

24  Exhibit 20 as an "AP-9 firearm" and testified that eight of the shell casings found at the scene

25

26        [8]  Indeed, during the second phase of the trial, which was heard by the court, the
prosecution, in seeking to formally qualify Officer Ward as a gang expert, elicited testimony
27  about various "gang" courses and seminars Officer Ward had attended, as well as the fact
that he had been qualified as an "expert on the recognition of criminal street gangs" in other
28  proceedings.  (See RT 1398-1400.)

of Crosby's murder had been fired from that particular AP-9 firearm.  (See RT 399:10-12, 25-26, 405:14-21.)  Later in the trial, Dan O'Malley ("O'Malley"), a prosecutor with the Contra Costa County District Attorney's Office, testified he had prosecuted a criminal action against Wade for assault against two police officers, that Exhibit 20 was the weapon involved in Wade's case, and that Wade, during the trial on the charges against him, testified he had possessed said weapon and had purchased it "on the street" after his home was burglarized in March 1993.  (See RT 482:19 - 485:28; 493:22-28.)[9]

Petitioner contends his counsel was ineffective in not objecting, on grounds of relevance, to evidence that Officer Zeppa had investigated the shooting of two police officers and to evidence that Wade had been tried for assaulting those police officers.  Such references, petitioner argues, suggested to the jury that the gun used to shoot at Crosby was also used to shoot at two police officers, which, according to petitioner, suggested that a connection existed between petitioner and Wade, when, in fact, there was no evidence of any such connection.  (Pet. at M-9 – M-10.)

Contrary to petitioner's claim, the evidence was relevant.  As noted, petitioner presented a defense based on misidentification and alibi.  As further noted, Crosby was killed on February 15, 1993, and the prosecution offered evidence that Exhibit 20, the AP-9, was used to fire rounds at Crosby at the time he was killed.  By O'Malley's testimony, the prosecution sought to rule out a defense that, in light of Wade's admission that he owned the AP-9, Wade was the person who used the AP-9 to shoot at Crosby.  In particular, O'Malley's testimony was offered to show that Wade did not obtain the AP-9 until after Crosby had been killed.  Additionally, evidence showing the circumstances under which Wade made his

---

[9]  No objection was made to O'Malley's testifying as to the above-referenced out-of-court statements by Wade.  Outside the presence of the jury, Wade had testified that he would "plead the Fifth Amendment" if he were asked any questions relating to the AP-9, after which the trial court found Wade was unavailable to testify.  (See RT 322:21 - 324:4, 325:24-25); Cal. Evid. Code § 1230 ("Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.").

United States District Court
For the Northern District of California

1   statement, specifically, an admission made in the course of a criminal trial in which he was

2   accused of a serious crime, was relevant to demonstrate the reliability of such evidence.

3   Further, if the jury had not been advised that the AP-9 was recovered by the police in the

4   course of their investigating a different crime, the jury may have mistakenly inferred that

5   Wade was a suspect in the Crosby murder.  Lastly, petitioner's contention that the reference

6   to an assault on officers was unduly prejudicial likewise is not supported by the record.[10]

7   There was no suggestion by the prosecution, or by any reasonable inference from the

8   evidence, that petitioner was in any manner involved in that later incident.

9       The California Supreme Court thus reasonably could have found the challenged

10  evidence was relevant and not unduly prejudicial, and, consequently, that the failure to object

11  to such evidence did not constitute deficient performance.  See Matylinsky, 577 F.3d at 1094.

12  Any such findings by the California Supreme Court cannot be characterized as "an error well

13  understood and comprehended in existing law beyond any possibility for fairminded

14  disagreement."  See Harrington, 131 S. Ct. at 786-87.

15      Accordingly, to the extent petitioner's ineffective assistance claim is based on a

16  failure to object to evidence that the AP-9 had been used in a different shooting and that

17  Wade had been tried for that different shooting, petitioner fails to show he is entitled to

18  habeas relief.

19          ii.  Motel Key

20

21      At trial, Sgt. Gormley was asked about various items seized from a residence at 324

22  Maine Street in Richmond, a residence Sgt. Gormley testified was "associate[d]" with

23  petitioner; Sgt. Gormley, on occasions prior to the search, had met petitioner there and had

24  seen petitioner come and go from that residence.  (See RT 340:9-14.)  During his direct

25  examination, Sgt. Gormley identified various items seized from a bedroom at 324 Maine

26  Street (see RT 342:21 - 343:21), which items, according to Sgt. Gormley, included "two

27  _____

28      [10]  Specifically, petitioner contends the evidence implied "that Third and Maine
    members had a propensity to shoot policemen."  (See Pet. at M-9.)

**United States District Court**
For the Northern District of California

1    motel room keys that were seized from the dresser drawer," one of which was a key "to the

2    Sea Horse Motel" (see RT 343:2-9), located in Richmond (see RT 380:20-28).

3         Petitioner contends his counsel should have objected to Gormley's testimony

4    regarding the key to the Sea Horse Motel, on grounds of lack of relevance.  In particular,

5    petitioner argues, admission of the key "suggested itself as a 'clue' tying defendants to

6    [Troy] Olsen and his Peugeot."  (Pet. at M-10.)

7         Testimony concerning the Sea Horse Motel was provided by Troy Olsen ("Olsen"), a

8    witness called by the prosecution.  Olsen testified that, in February 1993, he was "addicted to

9    crack cocaine," that he purchased crack cocaine in Richmond, and that he owned a Peugeot.

10   (See RT 463:25 - 464:13.)  Olsen also testified that, on one occasion in February 1993, he

11   purchased crack cocaine from a person he knew as "Mooch" in exchange for allowing

12   Mooch to use the Peugeot, and that, while "Mooch" was using the Peugeot, Olsen stayed at

13   the Sea Horse Motel.  (See RT 464:23 - 465:23, 466:8-12, 472:24-28.)  Olsen further testified

14   that the police later returned the Peugeot to Olsen's mother, and that the vehicle appeared to

15   have been damaged by bullets.  (See RT 465:25 - 466:4, 472:2-16.)

16        Sgt. Gormley testified that he interviewed Olsen, and that, during the interview, he

17   showed certain photographs to Olsen, at which time Olsen identified a photograph of

18   Mondrell Johnson ("Johnson") as the person he knew as "Mooch" and identified petitioner as

19   a person who was "in the area" when he made his "dope transactions for the car."  (See RT

20   540:3 - 541:4.)  Sgt. Gormley also testified that Johnson, petitioner, and Dorton were

21   members of the Third and Main group.  (See RT 531:15-537:7.)

22        In light of the above-referenced testimony by Olsen and Sgt. Gormley linking

23   petitioner to the car used in the shooting, and evidence that Johnson, petitioner, and Dorton

24   all were members of the Third and Main group, the California Supreme Court reasonably

25   could have found Sgt. Gormley's testimony about the key was relevant as corroborative of

26   Robinson's testimony and not unduly prejudicial, and, consequently, that the failure to object

27   to such evidence did not constitute deficient performance.  See Matylinsky, 577 F.3d at 1094.

United States District Court
For the Northern District of California

Any such finding by the California Supreme Court cannot be characterized as "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." See Harrington, 131 S. Ct. at 786-87.

Accordingly, to the extent petitioner's ineffective assistance claim is based on a failure to object to Sgt. Gormley's testimony regarding the Sea Horse Motel key, petitioner fails to show he is entitled to habeas relief.

c.     Failure to Call Witnesses

Petitioner claims his trial counsel was ineffective in failing to locate or call as witnesses Carolyn Morgan (now Carolyn Sample), Willis Alcutt, Terrence Williamson, and Edward Turner.  (Pet. at P-34, M-11.)

To succeed on a claim that counsel was ineffective in failing to call a favorable witness, a federal habeas petitioner must identify the witness, provide the testimony the witness would have given, show the witness was likely to have been available to testify and would have given the proffered favorable testimony, and demonstrate a reasonable probability that, had such testimony been introduced, the jury would have reached a verdict more favorable to the petitioner.  See Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003).  A petitioner's mere speculation that the witness would have given helpful information if interviewed by counsel and called to the stand is not enough to establish ineffective assistance.  See Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001).

In Dows v. Wood, 211 F.3d 480 (9th Cir. 2000), the Ninth Circuit denied a petitioner's claim that his counsel had been ineffective in failing to investigate and call a witness, where the petitioner provided only his own "self-serving affidavit" and no other evidence, such as "an affidavit from [the] alleged witness," that the witness would have given helpful testimony.  See id. at 486-87; cf. Alcala, 334 F.3d at 872 & n.3 (distinguishing, inter alia, Dows; finding ineffective assistance of counsel where petitioner submitted

interviews reflecting testimony absent witnesses would have provided).

### i. Sample, Alcutt, and Williamson

The Court first notes that petitioner has not submitted, with his petition or otherwise, any affidavit from Carolyn Sample ("Sample"), Willis Alcutt ("Alcutt"), or Terrence Williamson ("Williamson"). Rather, petitioner makes reference to declarations said individuals provided in 1996 in support of co-defendant Dorton's state habeas petition, copies of which were thereafter provided to this Court by respondent. (See Ex. L.) After a review of those declarations, the Court notes that none of the cited witnesses has said anything about petitioner.

Specifically, Sample stated in her declaration that she was riding in her car with Turner on February 12, 1993, that she witnessed the shooting of Crosby by four men in a "maroon car," and that she and Turner were situated behind the shooters at the time. (Ex. L.)[11] Sample further stated she "would probably recognize the passengers [of the maroon car] if [she] saw them again," and that when Dorton's brother, Clifford Dorton, showed her Dorton's 1989 driver's licence photo, she did not recognize him as one of the shooters. (Id.)[12]

Alcutt and Williamson stated they saw Dorton standing on the corner of Third and Maine streets on the day of the shooting, when three or four men in a "gold Peugeot' drove up and bragged about a guy they had just shot. (Ex. L.) They further stated Dorton was not one of the men in the Peugeot. (Id.)

In sum, none of the above-referenced witnesses offers anything of exculpatory value to petitioner. Consequently, petitioner has not shown "the result of the proceeding would

---

[11] The Court notes, as stated above, that the shooting actually occurred on February 15, 1993.

[12] Sample does not state whether she was shown the license at the time of her declaration or on some earlier occasion. As noted, however, the shooting occurred in 1993, four years after the year the photograph was taken.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    have been different" had defense counsel called them to testify.  See Strickland, 466 U.S. at

2    694.

3         Accordingly, to the extent petitioner's ineffective assistance claim is based on trial

4    counsel's not calling Sample, Alcutt, and Williamson as witnesses, petitioner fails to show he

5    is entitled to habeas relief.

6                                    ii.  Edward Turner

7         Although, as with the above three witnesses, petitioner has not submitted with his

8    petition a declaration from Edward Turner ("Turner"), the Court assumes petitioner is relying

9    on the declaration Turner provided in support of petitioner's motion for new trial (CT 390-

10   94), as well as on the testimony Turner gave at the hearing on that motion (RT 1448-89).

11        In neither instance, however, did Turner state he was available and willing to testify

12   for the defense at petitioner's trial.  Rather, in each instance, Turner stated under oath that he

13   had not wanted to get involved with the case from the beginning.  (See CT 393; RT 1452,

14   1481.)  Turner further stated he "disappeared from sight" after his interview with the police

15   because there were outstanding warrants for his arrest.  (CT 393.)  As Turner explained:

16
          [He] was on the run and avoiding all contact with the police.  [He] received
17        several telephone messages from the D.A.'s office, but did not return them.
          [His] grandmother also informed [him] that a private investigator working for
18        [petitioner's] attorney came by [and] left his business card.

19   (CT 394.)[13]  In short, petioner fails to show Turner "would have provided helpful testimony

20   for the defense."  Dows, 211 F.3d at 486.

21        Moreover, even if Turner would have testified, the helpfulness of any such testimony

22   was of limited value.  Turner's credibility, as the trial court observed, was subject to

23
24
25   _____
26        [13]  Turner stated he only agreed to speak to petitioner's attorney and investigator after
     he had been arrested and, on an unspecified date, "ultimately assigned" to the same county
27   jail module as petitioner.  (CT 394.)  Turner was arrested on November 16, 1994 (CT 394),
     six days after the close of evidence (see CT 128-29), and there is no showing that petitioner's
28   counsel had any reason to know of Turner's presence in the county jail prior to the
     conclusion of the trial.

                                           22

United States District Court
For the Northern District of California

1   question, for a number of reasons.  First, at the hearing on the motion for new trial, Turner

2   admitted to having incurred three prior felony convictions.  (<u>See</u> RT 1449.)  Turner also

3   admitted he was at that time awaiting trial on charges of robbery and cocaine possession.

4   (<u>See</u> <u>id.</u>)

5        Second, the declaration and testimony Turner gave in support of the new trial motion

6   were not consistent with the taped statement he gave the police, which was taken almost

7   immediately after the shooting.  In his declaration, Turner stated the right front and right rear

8   passengers definitely were not in the photo lineups he was shown (CT 392-93), and at the

9   hearing, Turner testified he was certain petitioner was not the person in the right front

10   passenger seat and that Dorton's complexion was too light for him to be the person in the left

11   rear passenger seat.  (RT 1479, 1483).[14]

12        In his taped interview with the police, however, the only person for whom Turner

13   gave a detailed description was the right rear passenger.  (<u>See</u> RT 1468, 1476.)  He was not

14   sure about the left rear passenger's description, claiming he had seen only the left rear

15   passenger's gun and that the individual was wearing all black.  (<u>See</u> RT 1471.)  Further,

16   when questioned about the changes in his version of the events since the police interview,

17   Turner stated he did not recall how he had described the left rear passenger at the time of the

18   interview (<u>see</u> RT 1468) and that his memory of the murder had improved over the previous

19   18 months (<u>see</u> RT 1465, 1473).

20

21        Lastly, the circumstances of the shooting independently cast doubt on Turner's

22   credibility as a witness.  As noted by the Court of Appeal, Turner had been "virtually in the

23   direct line of fire," as shown by Turner's own testimony that "ejected shells landed on

24   Morgan's car, that Morgan had been frantically trying to get him to duck down, and that he

25   himself had been afraid that the right rear passenger would shoot him."  (Ex. C at 9-10.)

26        In sum, petitioner has not made a sufficient showing that Turner would have been a

27

28       [14]  As noted, Robinson testified petitioner was in the right front passenger seat and Dorton was in the left rear passenger seat.

United States District Court
For the Northern District of California

1  witness at petitioner's trial, and, in any event, given the evidence available to impeach

2  Turner's credibility, petitioner has not shown "the result of the proceeding would have been

3  different" had the defense called him to testify.  See Strickland, 466 U.S. at 694.

4        Accordingly, to the extent petitioner's ineffective assistance claim is based on trial

5  counsel's not calling Turner as a witness, petitioner fails to show he is entitled to habeas

6  relief.

7              d.     Prosecution's Closing Argument

8        Petitioner claims his trial counsel was ineffective by not objecting to certain statements

9  made by the prosecutor during closing argument, each of which pertained to prosecution

10  witness Robinson, who, as discussed above, testified that he saw the shooting and identified

11  both petitioner and Dorton as being two of the shooters in the Peugeot.  (Pet. at M-11 – M-

12  12.)

13              i.  References to Discovery and Threats

14        Petitioner asserts that during the prosecution's closing argument, the prosecutor

15  referred to facts not in evidence, and that his trial counsel was ineffective in not objecting to

16  such statements.  The statements at issue pertained to threats Robinson reported had been

17  made against him.  Robinson, whose testimony from the second trial was read to the jury in

18  light of his unavailability at the third trial, testified he was in court testifying (in the second

19  trial) only because he had been arrested and brought to court, and that he did not appear at the

20  first trial, even though he had received a subpoena, because of "threats made through phone

21  calls."  (See RT 614:8 - 615:6.)  Robinson further testified that a deceased person, also named

22  Jonathan Robinson, and who, according to Robinson, was his "brother" and his "father's son,"

23  was killed, and that "when he got killed it was said to [Robinson] that he was the wrong one.

24  The wrong target."  (See RT 621:17-26.)[15]

---

[15]  The trial court gave the jury a limiting instruction concerning Robinson's testimony about threats.  Specifically, the trial court orally "admonished" the jury that such testimony was not being offered "for the truth of the matter stated, but to show the state of mind that the

United States District Court
For the Northern District of California

During the prosecution's closing argument, the prosecutor, commenting on why she had not offered testimony from Robinson in person, stated, "You know, people threatening his life, John Robinson being murdered right after the discovery being given out, maybe not that surprising he wasn't actually here." (See RT 1246.) Additionally, in her rebuttal argument, the prosecutor stated, "[T]hree days after Jonathan Robinson was killed, Toddy, the Jonathan Robinson that was killed,[16] three days after that, shortly after the discovery was given out, our John Robinson got a phone call where they were reading from police reports and telling him about video tapes." (See RT 1310:26 - 311:2.)

Petitioner argues it was ineffective for his counsel not to object to the above-quoted statements, because, according to petitioner:

> This sensational argument suggested that defendants had ordered the murder of the other Jonathan Robinson and had provided the discovery to other gang members, and the defense attorneys had been responsible for this unfortunate murder by giving their clients unredacted copies of the discovery. In fact, there was no evidence of any of this in the record. There was not even evidence that the defense attorneys had given their clients redacted copies of the discovery.

(Pet. at M-11.)

Contrary to petitioner's claim, there was no improper suggestion and there was ample evidence in the record to support the factual assertions made by the prosecution. In particular, Sgt.Gormley testified that he spoke to Robinson on January 25, 1994, at which time Robinson stated he had received "warnings" on Saturday, January 15, 1994. (See RT 1048:2-16.)[17] When Sgt.Gormley was asked what Robinson had told him, Sgt. Gormley testified as follows: "He said that his friend had told him there were people looking for him. That . . . they had

---

witness had at the time he was testifying in the other proceeding [the second trial]." (See RT 615:7-15.) Petitioner has not challenged the trial court's admission of such testimony.

[16] "Toddy" was the nickname of the Jonathan Robinson who was killed. (See RT 1052:21 - 1053:3.)

[17] The testimony was introduced on "cross-examination" of Sgt. Gormley, who was recalled as a defense witness and questioned on "direct" by petitioner's counsel as to a payment made by said witness to Robinson for relocation expenses, and other matters potentially bearing on Robinson's state of mind.

25

United States District Court
For the Northern District of California

read copies of my police reports to him, and they even quoted him some sections, including being interviewed in the C.I.B. interview room and videotaped."  (See RT 1048:19-25.)  Sgt. Gormley also testified "discovery had been made available that Thursday or Friday before he received the threats."  (See RT 1048:26 - 1049:5.)

In light of the above-referenced testimony from Sgt. Gormley, the California Supreme Court reasonably could have found an objection to the prosecutor's factual assertions about when discovery was provided and about the content of a threat made to Robinson, on the ground that no evidence had been offered to support those assertions, would have been meritless, and, consequently, that counsel was not ineffective in failing to make such objection.

Accordingly, to the extent petitioner's ineffective assistance claim is based on a failure to object to statements made in closing argument that "discovery" had been provided shortly before Robinson received a threatening call in which references were made to the content of police reports and to Robinson's having been videotaped, petitioner fails to show he is entitled to habeas relief.

## ii.  Reference to Robinson's Demeanor on Videotape

Petitioner alleges his counsel should have objected on Sixth Amendment grounds to the prosecutor's statement in closing argument that the jury, in determining Robinson's credibility, should consider Robinson's demeanor as it appeared on a videotape shown to the jury.  The videotape consisted of excerpts from an interview of Robinson conducted by Sgt. Gormley on the date of Crosby's murder.

During closing argument, the prosecutor identified several "factors" the jury could consider when determining a witness's credibility (see RT 1245:2-9), one such factor being the "[d]emeanor and manner of the witness while testifying" (see RT 1246:11-12).[18]  The

---

[18]  In discussing such "factors," the prosecutor was referencing the following standard instruction that had been given to the jury before closing argument:

United States District Court
For the Northern District of California

prosecutor acknowledged that Robinson was not "here" for the third trial, his testimony from the second trial having been read into the record, and then argued, referencing the videotaped interview, as follows: "But you got to see the demeanor of [Robinson] within an hour of the homicide, right after it happened. And I think all of you will agree that the demeanor of that witness was not unsure. He was excited by what had happened, but he was very, very much completely sure of what he was telling." (See RT 1246:21-26.) After addressing several other factors a jury could consider when determining Robinson's credibility, the prosecutor summed up her discussion of that issue as follows: "So when you look at all of these factors and the other factors, including your review of that tape - - and do review that videotape. Look at it again closely. Judge his demeanor and credibility. I think you'll find that this testimony alone is enough to convict both defendants." (See RT 1251:25 - 1252:1.)

As noted, petitioner claims his counsel should have objected, on Sixth Amendment grounds, to the above-referenced portions of the prosecution's closing argument. In particular, petitioner contends: "The People argued that the jury should consider Robinson's 'demeanor' exhibited on the videotape of the police interview. This argument deprived [petitioner] of his Sixth Amendment right to confrontation, since Robinson was never subjected to any cross-examination during the taped interview." (See Pet. at M-12.)

------------------------------------

In determining the believability of a witness, you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness, including but not limited to, any of the following:
The extent of the opportunity or the ability of the witness to see or hear or otherwise become aware of any matter about which the witness has testified;
The ability of the witness to remember or to communicate any matter about which the witness has testified;
The character and quality of that testimony;
The demeanor and manner of the witness while testifying;
The existence or nonexistence of a bias, interest or other motive;
Evidence of the existence or nonexistence of any fact testified to by the witness;
The attitude of the witness toward this action or toward the giving of testimony;
A statement previously made by the witness that is consistent or inconsistent with the testimony of that witness;
The witness' prior conviction of a felony; [and]
Past criminal conduct of the witness amounting to a misdemeanor.

(See RT 1210:22 - 1211:16); see also CALJIC No. 2.20.

United States District Court
For the Northern District of California

1   Petitioner did not argue to the California Supreme Court, nor has he argued in his
2   federal habeas petition, that the trial court's admission of the videotape violated his Sixth
3   Amendment rights, or that the videotape was otherwise erroneously admitted.  Rather,
4   petitioner's claim is based on the prosecutor's assertedly incorrect reference to the trial court's
5   instruction as applying to statements made out of court.  Petitioner has cited no authority,
6   however, holding, or even suggesting, that a valid Sixth Amendment objection could be made
7   in response to a closing argument commenting on the veracity of an out-of-court statement
8   that had been admitted into evidence, and which statement the petitioner has not claimed was
9   improperly admitted.  Under such circumstances, the California Supreme Court reasonably
10  could have found any Sixth Amendment objection made during closing argument would have
11  been meritless, and, consequently, that petitioner's counsel was not ineffective in failing to
12  make such an objection.

13      Accordingly, to the extent petitioner's ineffective assistance claim is based on a failure
14  to raise a Sixth Amendment objection to the prosecution's statement that the jury could
15  consider Robinson's demeanor as was shown on the videotape, petitioner fails to show he is
16  entitled to habeas relief.

17              iii.  <u>Vouching</u>
18

19      "Vouching consists of placing the prestige of the government behind a witness through
20  personal assurances of the witness's veracity, or suggesting that information not presented to
21  the jury supports the witness's testimony."  <u>United States v. Necoechea</u>, 986 F.2d 1273, 1276
22  (9th Cir. 1993).  Petitioner argues that the prosecutor's closing argument constituted a
23  personal assurance that Robinson was credible.

24      In particular, petitioner contends his counsel should have objected when the
25  prosecutor, according to petitioner, "concluded her closing argument by stating that ther[e] is
26  a 'Code of Silence' on the streets and that people like Jonathan Robinson 'don't go to the
27  police . . . unless they are telling the truth.'"  (<u>See</u> Pet. at M-12.)  Petitioner, however, takes
28  the prosecutor's remarks out of context.  What the prosecutor argued was as follows:

United States District Court
For the Northern District of California

There is a lot of evidence in this case. And I think a lot of credible evidence that shows that Jonathan Robinson, when he broke the Code of Silence, when he came forward, was telling the truth. If it wasn't for Jonathan Robinson approaching Ron Ward that very day and telling him it was [petitioner], it was Bo and other Main[e] Street boys, if it wasn't for Jonathan Robinson then going down by himself and sitting in the police station and giving an hour long interview, and if it wasn't for Jonathan Robinson being willing to sit here in court at one point and actually identify these two people, there wouldn't have been a case.

And there is absolutely no motive that you can come up, or the defense can come up with, as to why Jonathan Robinson would break that unwritten rule, but that very strong rule, that Code of Silence. You heard from everyone, even the defense witnesses, people don't go to the police. They don't go to the police unless they are telling the truth. Jonathan Robinson, who lived by the law of the land of the defendants, broke their rules.

(See RT 1323:10 - 1324:1.)

The prosecution's argument, read in context, can reasonably be understood as a comment on the evidence given at trial as to when a person would speak to the police, rather than a personal belief by the prosecutor concerning Robinson's veracity. Moreover, as the Ninth Circuit has observed: "Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." See Necoechea, 986 F.2d at 1281 (quoting Strickland, 466 U.S. at 689). In short, the California Supreme Court's determination of this claim cannot be characterized as an "error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." See Harrington, 131 S. Ct. at 786-87.

Accordingly, to the extent petitioner's ineffective assistance claim is based on a failure to object to the prosecution's statement concerning when a person would speak to the police, petitioner fails to show he is entitled to habeas relief.

C.    Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate

of appealability.  <u>See</u> Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, <u>id.</u> § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.  CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.  The petition for a writ of habeas corpus is hereby DENIED.

2.  A certificate of appealability is hereby DENIED.

3.  The Clerk shall enter judgment in favor of respondent and close the file.

4.  Additionally, the Clerk is directed to substitute Warden Rick Hill on the docket as the respondent in this action.

IT IS SO ORDERED.

DATED: July 31, 2012

MAXINE M. CHESNEY
United States District Judge

30